**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Vesta Holdings, LLC, *et al.*,[1] | Case No. 22-[_____] ([___]) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF RAPHAEL WALLANDER,
INDEPENDENT MANAGER OF VESTA HOLDINGS, LLC, IN SUPPORT
OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Raphael Wallander, hereby declare under penalty of perjury:

1.     I am the Independent Manager of Vesta Holdings, LLC ("Vesta"), a Delaware limited liability company, and the sole member of the special committee (the "Special Committee") of the board of directors of Vesta (the "Board"). Vesta and certain of its direct and indirect subsidiaries are debtors and debtors in possession in the above captioned chapter 11 cases (collectively, the "Debtors"). I have served as the sole member of the Special Committee since August 5, 2022, and as the Independent Manager of Vesta since August 15, 2022. I have more than 20 years of experience in the business restructuring industry and have advised companies, lenders, creditors, and corporate boards across a diverse range of domestic industries. In addition, I have significant advisory and governance experience as an independent director, manager, member, chairman of the board of directors, and chairman of restructuring committees of various distressed companies.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Vesta Holdings, LLC (8730); Summit Risk Advisors LLC (4225); and Dunham Insurance Agency, LLC (1992).  Vesta Holdings, LLC's service address is P.O. Box 25, Montgomeryville, PA 18936-0025.  Summit Risk Advisors LLC and Dunham Insurance Agency, LLC's service address is 160 Chapel Road #101, Manchester, CT 06042.

2.    In connection with the filing of this declaration (this "Declaration"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") in the United States Bankruptcy Court for the District of Delaware (this "Court") for relief under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").  To minimize the potential adverse impact of the commencement of these chapter 11 cases, the Debtors have requested certain "first day" relief in various applications and motions filed with the Court, each of which is listed in Section IV below (collectively, the "First Day Motions").  The First Day Motions seek relief intended to preserve the value of the Debtors by, among other things, satisfying certain prepetition claims and granting certain administrative and procedural relief to facilitate an orderly transition into and out of these chapter 11 cases.  This relief is critical to the Debtors' proposed sale process.

3.    As a result of my tenure with the Debtors, my review of relevant documents, and my discussions with members of the Debtors' advisors and management team, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  I submit this Declaration in support of the Petitions and the First Day Motions and to assist the Court and other parties in interest in understanding the Debtors' corporate history, business operations, and prepetition capital structure, as well as the circumstances that compelled the commencement of these chapter 11 cases as of the date hereof (the "Petition Date").

4.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' financial affairs and restructuring initiatives, or my opinions based upon my knowledge and experience.  I am authorized to submit this Declaration on behalf of the Debtors.  If called

IMPAC 10412772v.1

upon to testify, I could and would competently testify to the statements set forth in this Declaration, as the information in this Declaration is accurate to the best of my knowledge and belief.

## PRELIMINARY STATEMENT

5.    Historically, Vesta and each of its Debtor and non-Debtor affiliates (collectively, the "Company") provided wealth advisory, risk management services, and insurance brokerage services to individual and corporate clients across the United States.  In recent years, the Debtors have focused on growing their insurance brokerage services business, which is primarily operated under Debtor Summit Risk Advisors LLC ("Summit").  Summit primarily concentrates on property and casualty insurance ("P&C") offerings.  The Debtors undertook this growth by acquiring various independent insurance agencies that provide commercial, property, personal, and casualty lines, group benefits, and other ancillary business and specialty lines.  This growth strategy enabled Summit to successfully acquire best-in-class insurance agencies to expand its geographical presence, while simultaneously enhancing its roster of executive talent and regional operators.  Currently, Summit employs over 130 individuals with operations in eight states, including Connecticut, South Carolina, Texas, Florida, Georgia, Tennessee, Louisiana, and California.  Summit's growth strategy has fueled its financial and operational success.  Since its founding in 2019, Summit has consistently generated solid revenue growth, profitability, and return on investment while maintaining the highest quality of service for its clients.

6.    Despite Summit's operational success, its performance has been overshadowed by alleged misconduct carried out by Joshua Coleman ("Mr. Coleman")—Vesta's founder and the former Manager and Chief Executive Officer of Vesta.  As described in greater detail herein, I understand that this alleged misconduct includes the alleged misappropriation of funds borrowed

3

under certain financing agreements, as well as the purported transfer of Debtor assets[2] to third parties without the Prepetition Lenders' consent, as required under the Prepetition Credit Agreement (as defined herein). I understand that these alleged improprieties have resulted in numerous lawsuits[3] and may have (a) violated multiple covenants under the Prepetition Credit Agreement and (b) constituted a breach of Mr. Coleman's duties. Furthermore, this alleged misconduct meaningfully affected the Debtors' business by unsustainably increasing the Debtors' debt load, embroiling them in substantial prepetition litigation, and creating significant confusion among the Debtors' customers and other parties in interest.

7. For example, in apparent contravention of the covenants provided in the Prepetition Credit Agreement, unbeknownst to the Debtors, I understand that, in the late the Spring and early Summer of 2022, Mr. Coleman purportedly financed the accounts receivable of certain of the Debtors, which are subject to the perfected senior liens granted under the Prepetition Credit Agreement. I understand that Mr. Coleman defaulted under the receivables financing agreements shortly after entering these agreements. As shown in **Exhibit B** attached hereto, six of the counterparties to these purchase agreements have filed lawsuits arising from the receivables based financing transactions and may have named certain of the Debtors and/or the Acquired Agencies as defendants in those legal proceedings.[4] Thereafter, it appears that Mr. Coleman purported to accept service on behalf of the Debtors in some or all of these legal proceedings and thereafter also

---

[2]     This includes the purported transfer of certain of the Debtors' accounts receivables that are subject to the Prepetition Lenders' (as defined herein) valid liens.

[3]     **Exhibit B** attached hereto provides a schedule of the eight known pending litigation matters, as of the Petition Date, that involve Mr. Coleman's alleged misconduct and which may name a Debtor entity and/or an Acquired Agency (as defined herein) as a defendant.

[4]     As detailed on **Exhibit B** attached hereto, the Debtors understand that Mr. Coleman created entities with identical names to the Debtors in multiple jurisdictions. Because of this, it is unclear whether the Debtors are defendants in certain of the legal proceedings listed on **Exhibit B**.

purported to consent to judgments against the Debtors.  This has led to, among other things, the counterparties to certain receivables financing agreements seeking to collect the accounts receivable of certain of the Debtors by contacting the Debtors' customers and demanding payment. This has caused significant disruption to the Debtors' business and harm to the Debtors' relationships with their customers.

8.     Upon discovery of Mr. Coleman's alleged improprieties and following the Debtors' failure to make an interest payment under the Prepetition Credit Agreement, I understand that the Prepetition Agent (as defined herein) declared an event of default under the Prepetition Credit Agreement in June 2022.  The Prepetition Agent also exercised its proxy rights under the Prepetition Credit Agreement and promptly removed Mr. Coleman as Manager and Chief Executive Officer of Vesta.  I understand that such actions were taken at the direction of the Prepetition Lenders to protect the value of Summit's insurance brokerage services business from the impact of Mr. Coleman's alleged misconduct.

9.     Also in June 2022, it is my understanding that the Debtors' remaining management team began a review of potential restructuring alternatives, including the potential sale of the assets of Summit's profitable insurance brokerage services business (the "Insurance Brokerage Assets"). The Debtors' management team soon determined that a sale of the Insurance Brokerage Assets is the best available path to maximize value for the benefit of the Debtors and their stakeholders. Thereafter, to best ensure that their sale process yields a value-maximizing transaction, the Debtors commenced a prepetition marketing process for the Insurance Brokerage Assets.    The Debtors' management team began its sale process by identifying potential third-party purchasers in the Debtors' industry that may have an interest in acquiring the Insurance Brokerage Assets. The Debtors' management team then began its outreach to these potential purchasers in July 2022.

This process garnered interest, including multiple preliminary, non-binding indications of interest from potential third party purchasers. Additional details about the marketing process are set forth below.

10. Shortly after the management team commenced the sale process, on August 5, 2022, the Board appointed me as the sole member of the Special Committee of the Board, and, on August 15, 2022, the Prepetition Agent, acting as the sole member of Vesta, appointed me as the Independent Manager of Vesta. The Special Committee was vested with broad authority regarding, among other things, any potential restructuring transaction involving the Debtors and any potential claims or causes of action the Debtors may have with respect to Mr. Coleman's alleged misconduct.

11. Following my appointment, I determined that the Debtors' industry reputation and future growth prospects were in jeopardy due to the impact of Mr. Coleman's alleged misconduct. Accordingly, I began to work with the Debtors' management team to continue its review of potential strategic alternatives and review the non-binding indications of interest received to date by the Debtors in connection with their prepetition sale process. Shortly thereafter, in mid-August and September 2022, the Debtors engaged legal counsel and a financial advisor to aid in their prepetition sale process and review of potential strategic alternatives. Upon their engagement, the Debtors' advisors then, in coordination with the Debtors' management team, led discussions with each of the potential third-party purchasers, including those parties that had submitted non-binding indications of interest.

12. These discussions progressed over the next several weeks, garnering further interest for the Insurance Brokerage Assets. However, it soon became clear to the Debtors from their advisors' discussions with the potential third-party purchasers that these potential purchasers were

unable or unwilling to enter into a stalking horse purchase agreement prior to the commencement of these chapter 11 cases.

13.     The Debtors therefore approached their Prepetition Lenders to explore their willingness to backstop the sale process by serving as stalking horse bidder.  The Debtors believed it was critical to find a stalking horse bidder to provide confidence within the industry that the Debtors' business will remain intact as a going concern.  The Debtors' negotiations with the Prepetition Lenders were ultimately successful and culminated in the parties' entry into the Stalking Horse Agreement (as defined herein) on October 30, 2022.  The Stalking Horse Agreement offers the Debtors and their stakeholders certainty by establishing a minimum purchase price for the Insurance Brokerage Assets, providing stability to the Debtors' employees who will be a part of the go-forward business, and signaling to other potential bidders the prevailing market value of the Insurance Brokerage Assets.  The Stalking Horse Agreement remains subject to the Debtors' receipt of higher or better offers pursuant to the bidding procedures proposed in the Debtors' Bidding Procedures Motion.[5]

14.     In addition, the Prepetition Lenders have also financially supported, and continue to financially support, the Debtors' business and restructuring efforts.  *First*, when the Debtors faced insufficient liquidity to fund the costs of preparing for these chapter 11 cases in a manner that would minimize disruption to the Debtors' business, the Prepetition Lenders funded, pursuant

---

[5]     Contemporaneously with the filing of this Declaration, the Debtors filed their *Motion of Debtors for an (I) Order (A) Approving Bidding Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets; (B) Authorizing the Debtors to Enter Into the Stalking Horse Agreement with Bid Protections; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Scheduling an Auction and Sale Hearing; (E) Approving the Form and Manner of Notice Thereof; (F) Authorizing the Debtors' to Pay the 2022 Earnout Payment; and (G) Granting Related Relief; and an (II) Order (A) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* (the "Bidding Procedures Motion").

to the second amendment to the Prepetition Credit Agreement (the "<u>Second Amendment</u>"), approximately $3.8 million on September 13, 2022 (the "<u>Bridge Financing</u>").    The Bridge Financing provided essential liquidity to the Debtors that allowed them to best position themselves for a smooth entry into chapter 11.    The Bridge Financing also enabled the Debtors to remain current on ordinary course operational expenses.    Accordingly, the Debtors do not anticipate significant prepetition trade claims that will be subject to these chapter 11 cases.

15.    *Second*, the Prepetition Lenders have also agreed to provide a superpriority, senior secured $37.88 million debtor in possession financing facility (the "<u>DIP Facility</u>"), subject to the Court's approval.    The DIP Facility will ensure that the Debtors have the liquidity required to conduct the sale process contemplated in the Bidding Procedures Motion and close a value-maximizing transaction.    Importantly, the DIP Facility also provides the financing necessary for the Debtors to responsibly administer these chapter 11 cases and seek confirmation of a chapter 11 plan.[6]    The DIP Facility also contemplates, in connection with the Stalking Horse Agreement, negotiating an agreed-to, post-sale wind down amount to ensure the Debtors' can liquidate and wind down their estates following consummation of a sale.

16.    The Debtors commenced these chapter 11 cases with their reputation hanging in the balance.    Due to their tireless prepetition efforts, however, I believe the Debtors have before them a well-supported and value-maximizing path that will culminate in the consummation of a sale—whether to the Stalking Horse Bidder (as defined herein) or a third party—as well as ultimate resolution of these chapter 11 cases through a chapter 11 plan.    However, if the Debtors are to

---

[6]    The Debtors intend to file a joint chapter 11 plan for the Debtors (the "<u>Plan</u>") shortly after the Petition Date.    To ensure the Debtors move expeditiously through the chapter 11 process and to preserve the value of their estates, the Debtors, in conjunction with their advisors and under the oversight of the Special Committee, have determined that it is in the Debtors' best interests to proceed with the Plan confirmation process in parallel with their sale process.

8

successfully resolve these chapter 11 cases, it is imperative that the Debtors move quickly from the outset of these chapter 11 cases—both to maintain the stability of their business and to establish a process for the swift and orderly transition of the Debtors' business to the ultimate successful bidder.  I believe that only by promptly providing certainty regarding the Debtors' future to their vendors, customers, regulators, and workforce will the Debtors be able to preserve their business and extricate themselves from out of the shadow cast by Mr. Coleman's alleged misconduct.

## BACKGROUND

17.     To familiarize the Court with the Debtors, their business, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration into four parts.  *Part I* provides a general overview of the Debtors' corporate history and business operations.  *Part II* provides an overview of the Company's prepetition capital structure.  *Part III* describes the circumstances leading to the filing of these chapter 11 cases.  *Part IV* discusses the First Day Motions.

I.      **GENERAL BACKGROUND.**

A.      **THE DEBTORS' CORPORATE HISTORY.**

18.     In 2008, Mr. Coleman, and certain of his family members, founded a single-family insurance brokerage office.  Thereafter, Mr. Coleman expanded the operations of this single-family office based on the needs of its client base, which consisted predominately of high net worth individuals previously known to the Coleman family.  This expansion included the addition of financial planning, comprehensive risk management, additional insurance lines, and wealth advisory services.  One such example of Mr. Coleman's expansion strategy includes his establishment of the Debtors' non-Debtor affiliate, MRM Risk Holdings, LLC, a Delaware limited liability company, in 2011, along with the founding of its non-Debtor subsidiaries Momentum Advanced Planning, LLC and MRM Assurance Services, Inc. (collectively, "Momentum").

9

Momentum was founded by Mr. Coleman to provide life insurance lines and related advisory services to high net worth individuals known to Mr. Coleman and his family.

19.    Vesta was founded by Mr. Coleman in 2018 as the holding company for certain legacy entities of the Company, which, at the time, provided financial planning, risk management and wealth advisory services to clients in the Southeast region of the United States.  Mr. Coleman served as the Manager and Chief Executive Officer of Vesta from Vesta's founding in 2018 until June 2022.

20.    Summit, which is headquartered in Connecticut, was originally formed in 2019 through a merger of multiple insurance agencies.  In February 2021, Vesta purchased 100% of the membership interests of Summit from Summit's prior owner, SEK Holding Co LLC, a Delaware limited liability company.  After Vesta's acquisition of Summit, the Company began to shift from providing financial planning, risk management and wealth advisory services to focusing on the growth of Summit's insurance brokerage services business.  To that end, since its acquisition by Vesta, Summit has continued to build its brokerage platform through its acquisition of high-performing insurance agencies exhibiting consistent financial performance and a diverse book of business.  Summit's recent acquisitions include:  SA Benefit Services, LLC, on January 1, 2021; Baluja & Associates, on February 1, 2021; Mappus Insurance Agency, Inc. ("Mappus"), on September 1, 2021; and Crescent Insurance Advisors, Inc. ("Crescent"), on May 18, 2022.  Currently, the Debtors, through Summit, solely provides insurance brokerage services, focusing on P&C insurance offerings, to individual and corporate clients across the United States.

## B.    THE DEBTORS' OPERATIONS.

21.    As of the Petition Date, the Debtors provide insurance brokerage services through nineteen offices across eight states.  As discussed above, the Debtors' primary business operations

consist of Summit's insurance brokerage business pursuant to which Summit offers both personal lines insurance and commercial lines insurance across its geographically diverse platform. Currently, Summit operates as a large independent regional insurance brokerage, focusing on P&C insurance, with offices in Connecticut, South Carolina, Texas, Florida, Georgia, Tennessee, Louisiana, and California, as shown in the graphic below.  As of the date of this Declaration, Summit is the 94th largest P&C insurance agency in the United States.

### Summit's Office Locations (By State)



22.    Although it maintains the capability to provide brokerage services for a broad spectrum of insurance needs, Summit specializes in the following sectors: restaurants, moving and storage, stop loss, personal high net worth, marine and cargo, retail, and assisted living centers. As of August 31, 2022, Summit has over 130 employees and approximately 66,000 issued policies accounting for approximately $175.0 million in annual premiums.

23.    As a result of its strategic acquisitions, Summit operates a diverse portfolio of insurance agencies located across the United States, including a strong presence in the Southeast.

IMPAC 10412772v.1

Such geographic diversification and the diversification of its business lines enables Summit to mitigate business risks inherent in the insurance industry.  Importantly, Summit does not write any insurance policies and therefore does not assume any policy risk.  Rather, Summit earns commissions on the policies sold by its insurance agencies.  Since its founding in 2019, Summit has consistently generated industry-leading revenue growth and profitability.  Accordingly, the Debtors believe that Summit remains uniquely situated and poised for organic growth led by its highly regarded management team and diverse portfolio.

## II.    THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE.

24.    Vesta currently owns, directly or indirectly, each of the other Debtor entities, as well as certain other non-Debtor entities.  A summary chart depicting the Company's corporate structure is shown below:



The Debtors' corporate records are not a model of clarity.  Based upon a review of available records, the Debtors believe Momentum is likely a direct subsidiary of the parent entity of Vesta, Burtonvic Capital, LLC – Vesta Series ("Burtonvic Vesta Series"), a Delaware series limited

liability company of which Vesta is a majority-owned subsidiary.  Burtonvic Capital, LLC ("Burtonvic Capital"), a Delaware limited liability company, is the majority owner of Burtonvic Vesta Series, and Burtonvic Capital is in turn, upon information and belief, owned by certain trusts controlled by Mr. Coleman and the Coleman family.  Prior to the Petition Date, I understand that there was uncertainty regarding whether Momentum was actually a subsidiary of Vesta; however, the organizational documents for such entities do not support the conclusion that any of the Momentum entities, including MRM Risk Holdings, LLC, Momentum Advanced Planning, LLC and MRM Assurance Services, Inc., are direct or indirect subsidiaries of Vesta.  Additionally, the Debtors understand that Mr. Coleman also allegedly engaged in misconduct related to Momentum.  Neither the Momentum entities, nor Burtonvic Vesta Series, or Burtonvic Capital are debtors in these chapter 11 cases.

25.    As of the Petition Date, the Debtors have approximately $126.7 million of funded debt obligations, consisting of obligations under the Prepetition Credit Agreement and the Seller Notes (each as defined below).

26.    The following table details the Debtors' prepetition capital structure (as of October 31, 2022) with respect to funded debt, exclusive of accrued but unpaid interest and fees.

| Instrument | Amount | Rate | Maturity |
|---|---|---|---|
| Prepetition Credit Agreement | **$125.7 million** | L+10.0% | Sept. 1, 2023 |
| **Total Secured Debt** | **$125.7 million** | | |
| Seller Notes | **$953,761** | Various | Apr. 2023 – Mar. 2030 |
| **Total Unsecured Debt** | **$953,761** | | |
| **Total Debt Outstanding** | **$126.7 million** | | |

A.    **PREPETITION CREDIT AGREEMENT.**

27.    On September 1, 2020, Vesta entered into that certain credit agreement, by and among Burtonvic Capital, MRM Risk Holdings, LLC, Vesta Advisors, LLC, Vesta Capital

Partners, LLC and Vesta VFO, LLC, each as borrowers (together, the "Initial Borrowers"),

Burtonvic Capital, Momentum Advanced Planning, LLC and MRM Assurance Services, Inc., each

as guarantors (together, the "Initial Guarantors"), the lenders from time to time party thereto

(collectively, the "Prepetition Lenders"), Alter Domus (US) LLC, as collateral agent and as

administrative agent for the Prepetition Lenders (the "Prepetition Agent"), and CB Agent Services

LLC, as origination agent for the Prepetition Lenders (the "Origination Agent") (as amended,

restated, amended and restated, supplemented, or otherwise modified from time to time,

the "Prepetition Credit Agreement" or the "Financing Agreement" and the term loans issued

thereunder from time to time, the "Prepetition Term Loans").  The Prepetition Credit Agreement

is secured by substantially all of the Debtors' assets and matures on September 1, 2023.  At its

inception, the Prepetition Credit Agreement provided for a multi-draw term loan in the aggregate

principal amount of $50 million.

### 1.    First Amendment to Prepetition Credit Agreement

28.    On February 25, 2021, the Initial Borrowers, the Initial Guarantors, the Prepetition

Lenders, the Prepetition Agent, and the Origination Agent entered into the first amendment to the

Financing Agreement (the "First Amendment"), which amended the Prepetition Credit Agreement

to, among other things, provide for additional term loans in the aggregate principal amount of

$93 million, bringing the aggregate principal amount of available Prepetition Term Loans to

$143 million.

### 2.    Joinder Agreement to Prepetition Credit Agreement

29.    On November 19, 2021, Summit and Summit's wholly-owned subsidiary, Debtor

Dunham Insurance Agency, LLC ("Dunham" and, together with Summit, the "Additional

Borrowers"), entered into that certain joinder agreement to the Prepetition Credit Agreement

(the "Joinder Agreement"), pursuant to which the Additional Borrowers became borrowers under

14

the Prepetition Credit Agreement.  The Additional Borrowers also entered into related pledge and security agreements to pledge substantially all of their assets as additional collateral to secure the Prepetition Term Loans.  After execution of the Exchange Agreement (as defined below), Burtonvic Vesta Series also joined the Prepetition Credit Agreement through the Joinder Agreement, becoming an additional guarantor and pledging 100% of its membership interests in Vesta to secure the Prepetition Term Loans.

### 3.    Second Amendment to Prepetition Credit Agreement

30.     On September 13, 2022, Vesta, as borrower, the Prepetition Agent, the Origination Agent, and the Prepetition Lenders entered into the Second Amendment.  The Second Amendment provided for additional Prepetition Term Loans in the aggregate principal amount of approximately $3.8 million.  As detailed herein, the Prepetition Lenders agreed to provide the Bridge Financing pursuant to the Second Amendment to enable the Debtors to advance their contingency planning initiatives.  The Bridge Financing provided essential liquidity to the Debtors that allowed them to best position themselves for a smooth entry into these chapter 11 cases without delaying or deferring payment of the Debtors' ordinary course operational expenses. As of the Petition Date, approximately $123.75 million in principal amount and $1.95 million in accrued interest remain outstanding on the Prepetition Term Loans.

### B.    SELLER NOTES

31.     Summit financed the purchase price of certain of its acquisitions of independent insurance agencies, in part, through seller financing pursuant to which Summit issued unsecured seller notes (the "Seller Notes") to the owners of the acquired agencies (the "Acquired Agencies"). As detailed in the chart below, as of the Petition Date, Summit currently has eleven Seller Notes outstanding in the aggregate principal amount of approximately $953,761 and $18,624 in accrued interest outstanding thereunder.

15

| Note Number | Current Balance | Amount of Monthly Principal Paid | Amount of Monthly Interest Paid |
|---|---|---|---|
| 1 | $409,588 | $3,714 | $2,411 |
| 4 | $310,382 | $10,399 | $1,403 |
| 8 | - | - | $5,730 |
| 9 | $11,018 | $1,815 | $43.00 |
| 10 | $11,018 | $1,815 | $43.00 |
| 11 | - | - | $7,733 |
| 12 | $13,465 | $13,399 | $134.00 |
| 13 | $41,658 | $10,296 | $238.00 |
| 14 | $4,791 | $4,769 | $44.00 |
| 16 | $15,418 | $2,159 | $103.00 |
| 22 | $136,423 | $12,035 | $742.00 |
| **Total** | **$953,761** | **$60,401** | **$18,624** |

32.     Achieving growth through the acquisition of the Acquired Agencies, and the resulting revenue streams of the Acquired Agencies' customers obtained thereby, is the lifeline of Summit's business.  Consequently, Summits' operational success and profitability are highly dependent on maximizing the earnings of the Acquired Agencies and maintaining the key business relationships between the Acquired Agencies and their customers.  Any default by the Debtors of their obligations under the Seller Notes would likely result in, among other things, reputational harm to Summit's business and default under, and the termination of, the respective purchase agreement by the applicable Acquired Agency.  This would likely result in the loss of the Acquired Agency's book of business and the loss of revenue.  The Debtors believe that the loss of revenue generated by the customers of the Acquired Agencies would destroy the value of Summit's business and derail the Debtors' proposed sale process at this critical juncture in their restructuring.

33.     Importantly, the Stalking Horse Bidder's interests are aligned with the Debtors in ensuring that the Debtors remain current on their obligations to the Acquired Agencies under the Seller Notes.  In furtherance of this objective, the Stalking Horse Bidder has agreed to assume the

16

Seller Notes as Assumed Liabilities pursuant to the Stalking Horse Agreement, subject to the Court's approval. This will preserve and maximize the value of the Debtors' estates and ensure the Debtors are able to close a value maximizing transaction pursuant to their proposed postpetition sale process.

C.     **MEMBERSHIP INTERESTS IN VESTA.**

34.     As of the Petition Date, Vesta is a majority owned subsidiary of Burtonvic Vesta Series. Prior to May 2021, the majority of Vesta's membership interests were held by Burtonvic Capital, with SEK Holding Co LLC, Povedanao Revocable Trust and Stad Chata Enterprises, LLC each holding minority interests (together, the "Exchanging Minority Owners").[7]     On May 10, 2021, Vesta, Burtonvic Capital, Burtonvic Vesta Series, and the Prior Minority Holders entered into that certain exchange agreement (the "Exchange Agreement"), pursuant to which Burtonvic Capital and the Exchanging Minority Holders agreed to exchange their membership interests in Vesta for membership interests in Burtonvic Vesta Series, then a newly created series limited liability company, making Vesta a majority owned subsidiary of Burtonvic Vesta Series. The parties entered the Exchange Agreement for corporate structuring purposes to consolidate Vesta and its direct and indirect subsidiaries under one holding company.

III.     **CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES.**

35.     The need to commence these chapter 11 cases arose due to the harm caused by Mr. Coleman's alleged misconduct. The Debtors have experienced strained liquidity and restricted operational flexibility because of Mr. Coleman's alleged misconduct and its impact on the Debtors' business and ability to access additional and new capital. This impact cannot be

---

[7]     After the execution of the Exchange Agreement and as part of the consideration provided by Summit in the applicable acquisitions, the former owners of Mappus and Crescent received 3.29% and 1.23%, respectively, of the outstanding equity in Vesta. The former owners of Mappus and Crescent were not party to the Exchange Agreement and continue to maintain their equity holdings as of the Petition Date.

IMPAC 10412772v.1

overlooked.  The uncertainty created by Mr. Coleman's alleged misconduct and the outstanding litigation proceedings in connection therewith, as shown on **Exhibit B** attached hereto, have upended the Debtors' business, hindered the Debtors' prepetition sale process, and forced the Debtors to file these chapter 11 cases.

36.    Accordingly, as detailed below, the Debtors have determined, at the direction of the Special Committee, that a sale of substantially all of their assets is the best available path to maximize the value of their estates and is in the best interests of the Debtors and their stakeholders. The Debtors' proposed postpetition sale process is exactly what is necessary to escape the shadow of Mr. Coleman's alleged misconduct and allow Summit's insurance brokerage business to operate as a going concern with a clean slate.

### A.    CHALLENGES FACING THE DEBTORS' BUSINESS.

37.    Despite the growth and profitability of Summit's insurance brokerage business, alleged misconduct committed by Mr. Coleman has threatened the Debtors' industry reputation and future growth.  To date, this alleged misconduct has resulted in several known outstanding litigation proceedings that may name a Debtor entity and/or an Acquired Agency as a defendant, as detailed on **Exhibit B** attached hereto.  I understand that Mr. Coleman's alleged misconduct includes the alleged misappropriation of funds drawn under certain financing agreements, which draws may have been prompted by Mr. Coleman's alleged use of fraudulent documents and newly created entities (with identical corporate names of the Debtors and Momentum but formed in different jurisdictions) to mislead lenders.  I further understand that Mr. Coleman entered financing agreements with third-party lenders to purportedly fund the acquisition of potential target insurance brokerage firms.  In addition, Mr. Coleman allegedly created fraudulent documentation, such as false bank records, notices of borrowing, asset purchase agreements, financial information and projections, and certificates of compliance, to mislead such third-party lenders and induce the

18

transfer of amounts under the applicable financing agreements for other non-approved purposes. I understand that this alleged misconduct may have constituted, among other things, a breach of Mr. Coleman's duties owed to the Debtors.

38.     In addition, as the Debtors prepared for these chapter 11 cases, the Debtors have become aware of several fraudulent transactions involving Mr. Coleman in which he improperly transferred Debtor assets, specifically accounts receivable, to third parties.  As shown on **Exhibit B** attached hereto, the Debtors are aware of six lawsuits that remain outstanding that arise specifically from these accounts receivable financing transactions.  As alleged in the complaints filed in the various lawsuits, I understand that Mr. Coleman effectuated the purported transfer of Debtor assets—including certain accounts receivable that were subject to the Prepetition Lenders' valid liens—to third parties in violation of the covenants under the Prepetition Credit Agreement.

39.     The Debtors were unaware of Mr. Coleman's entry into the receivables financing transactions.  In certain cases, the Debtors were unaware of the pending litigation against certain of the Debtors arising from the transactions until judgments were entered against the applicable Debtor entities.  In addition, in certain instances, plaintiffs who assert judgements against the Debtors arising from Mr. Coleman's alleged misconduct have contacted the Debtors' customers to collect customer payments owed to the Debtors.  This has caused confusion among the Debtors' customers and resulted in a disruption to the Debtors' business.

40.     The impact of Mr. Coleman's alleged misconduct and the numerous lawsuits in connection therewith have also hindered the Debtors' prepetition sale process.  Indeed, after my appointment, it became apparent to me that the numerous outstanding lawsuits and alleged fraudulent transactions would limit the Debtors' ability to make fundamental representations to any purchaser of the Insurance Brokerage Assets.  Furthermore, while the Prepetition Lenders

maintain a first lien security interest on substantially all of the Debtors' assets, the outstanding litigation has led to the introduction of competing claims from certain of these litigation related creditors, who in certain instances have filed UCC financing statements in various jurisdictions. These factors, among others, have created uncertainty, undermined the Debtors' out-of-court sale process, and forced the Debtors' to pursue a chapter 11 filing. The Debtors are still working with their advisors to identify the full extent of the misconduct committed by Mr. Coleman and others, and the Debtors reserve all of their rights with respect to any claims or causes of action in connection therewith.

41.    As previously noted, in June 2022, upon discovery of Mr. Coleman's alleged misconduct and the Debtors' failure to satisfy an interest payment under the Prepetition Credit Agreement, I understand that the Prepetition Agent declared an event of default under the Prepetition Credit Agreement, and, among other things, exercised its proxy rights under the Prepetition Credit Agreement and removed Mr. Coleman as Manager and Chief Executive Officer of Vesta on June 26, 2022. On that same day, the Board appointed Michael Hines, the current Chief Financial Officer of Summit, as Manager of Vesta. Thereafter, on August 5, 2022, the Board established the Special Committee with the responsibilities described below and appointed me as the Sole Member of the Special Committee. On August 15, 2022, the Board appointed me as the Independent Manager of Vesta.

42.    The responsibilities of the Special Committee, include, among other things, (a) addressing issues related to a potential financial restructuring of the Debtors, including potential strategic transactions, recapitalizations, financings, amendments, waivers, restructurings, rights offerings, sales of equity or assets or other transactions; and (b) investigating, pursuing, defending, settling, and/or otherwise resolving any and all actual or potential claims or causes of

action (i) the Debtors have or may have, including, without limitation, claims and causes of action related to Mr. Coleman, Burtonvic Capital, and its direct and indirect subsidiaries; and (ii) that may be brought against the Debtors by any person or entity.

43.     Mr. Coleman's alleged misconduct threatens the business relationships, trust, and stability that are key to the Debtors' business.  Indeed, despite the success of its insurance brokerage services business, Summit's value as a going concern is being endangered by reputational risks caused by Mr. Coleman's alleged misconduct.  As such, to preserve the value of Summit's business, the Debtors have determined that it is critical that the Debtors pursue a going concern sale of the Insurance Brokerage Assets.  The Debtors determined that the proposed sale is in the best interests of the Debtors' estates and their stakeholders because it will separate the Debtors from the shadow of Mr. Coleman's alleged misconduct and should maximize the value of the Debtors' estates.

**B.**     **THE DEBTORS' EFFORTS TO ADDRESS BUSINESS CHALLENGES AND THE PREPETITION MARKETING PROCESS.**

44.     Facing the ripple effects of Mr. Coleman's alleged misconduct, the Debtors and their management began reviewing potential strategic alternatives and alternative financing options to maximize value.  As a result of such review, the Debtors' management team soon determined that a sale of the Insurance Brokerage Assets is the best available path to maximize the value of the Debtors' estates and its business for the benefit of the Debtors' stakeholders.  The Debtors' management team thereafter began identifying potential third-party purchasers that may have interest and the resources to acquire the Insurance Brokerage Assets.  Management then began its outreach to these potential purchasers in July 2022 and provided such parties with Confidential Information Memoranda regarding the Debtors' business.  As a result of this outreach,

21

three potential third-party purchasers submitted non-binding indications of interest in August 2022 to the Debtors to purchase the Insurance Brokerage Assets.

45.    To aid in the Debtors' review of potential strategic alternatives and review the non-binding indications of interest submitted by potential third-party purchasers, the Debtors retained Ropes & Gray LLP as legal counsel on August 8, 2022.  Shortly thereafter, in connection with the sale process, and as the Debtors prepared for a potential chapter 11 filing, the Debtors determined that it would be prudent to retain a financial advisor.  Thereafter, on September 14, 2022, the Debtors engaged Province LLC ("Province") to act as their financial advisor in connection with the sale process and evaluation of other strategic alternatives.

46.    Since its engagement, Province, in conjunction with the Debtors, has led the Debtors' outreach to potential third-party purchasers regarding a going concern sale transaction for the Insurance Brokerage Assets.  This outreach included those parties who had already submitted non-binding indications of interest.  In the weeks leading up to the Debtors' chapter 11 filing, Province continued to facilitate diligence between the Debtors and the potential third-party purchasers.    In  addition,  Province  informed  the  potential  third-party  purchasers  of  the Debtors' potential chapter 11 filing, which would likely include a sale of the Insurance Brokerage Assets pursuant to section 363 of the Bankruptcy Code.  In late-September 2022, discussions with the potential third-party purchasers hit an impasse, however.  This was primarily due to the uncertainty  regarding  the  impact  of  the  numerous  lawsuits  outstanding  arising  from Mr. Coleman's alleged misconduct and the uncertainty surrounding an in-court sale process.  Accordingly, despite the efforts of the Debtors, with the support of their advisors, and the interest garnered by the process, it became clear that no third party was able or willing to enter into a stalking horse purchase agreement prior to the commencement of these chapter 11 cases.

### C.    THE DEBTORS' ENTRY INTO THE STALKING HORSE AGREEMENT.

47.    In late-September 2022, as it became apparent that the Debtors would be unable to achieve a third-party stalking horse purchase agreement prior to the commencement of these chapter 11 cases, the Debtors began discussions with the Prepetition Lenders regarding whether they would be willing to serve as the stalking horse and thereby backstop the marketing and sale process.  These discussions and negotiations ultimately bore fruit and, on October 30, 2022, the Debtors and an affiliate of certain of the Prepetition Lenders, SRA Holdings, LLC (the "Stalking Horse Bidder"), entered into a stalking horse asset purchase agreement (the "Stalking Horse Agreement"), which is attached as Exhibit C to the Bidding Procedures Motion filed contemporaneously herewith.

48.    The Stalking Horse Agreement was the product of arm's-length, good-faith negotiations among the Debtors and the Stalking Horse Bidder and represents the highest or otherwise best offer the Debtors have received to date.  The negotiation of the Stalking Horse Agreement on behalf of the Debtors was led by the Debtors' management and advisors under the oversight of the Special Committee.  On October 30, 2022, the Special Committee adopted resolutions authorizing the Debtors to enter into the Stalking Horse Agreement.

49.    The Stalking Horse Agreement is subject to higher or better offers and includes a provision for the payment of capped expense reimbursement upon the Debtors' consummation of an alternative sale transaction.  The expense reimbursement is capped at an aggregate maximum amount of $1.5 million.  Based on my knowledge and experience, the expense reimbursement cap is fair and reasonable in amount and reasonably intended to compensate for the risk that the Stalking Horse Bidder is taking by setting a baseline price and investing resources in making its bid.

**D.**     **PROPOSED    BIDDING    PROCEDURES    AND    POST-PETITION MARKETING PROCESS.**

50.     As described above, the Debtors believe that a prompt sale of the Insurance Brokerage Assets through a competitive process is the best option available to maximize the value of the Insurance Brokerage Assets for all stakeholders in these chapter 11 cases.  In light of the challenges the Debtors face, the Debtors are critically focused on maintaining the stability of the business and providing certainty to their vendors, customers, regulators, and workforce regarding the path forward for the business by consummating a value maximizing sale transaction. Prepetition, the Debtors took important first steps toward achieving that goal by initiating their marketing and sale process, as well as negotiating and executing the Stalking Horse Agreement. It is critical that the Debtors seize on that momentum by cementing a process for the swift and orderly transition of the Debtors' business to the ultimate successful bidder.  Doing so will signal to the Debtors' customers, vendors, regulators, employees, and other constituents from the outset of these chapter 11 cases that the Debtors' situation is only temporary and that the business will emerge from the chapter 11 process with new owners and a clean slate and wholly separated from Mr. Coleman and the consequences of his alleged misconduct.

51.     Accordingly, the immediate focus of these chapter 11 cases is the approval of the sale of the Insurance Brokerage Assets to the Stalking Horse Bidder or such other buyer that emerges postpetition with a higher or otherwise better offer for the Insurance Brokerage Assets. While there is a real need for expediency here, the Debtors recognize that conducting a competitive postpetition marketing process on the terms and conditions set forth in the Stalking Horse Agreement and the Bidding Procedures Motion is appropriate and necessary to ensure that the value of the Insurance Brokerage Assets is maximized.  To that end, there may be entities, in

addition to the Stalking Horse Bidder, interested in participating in the auction with respect to the Insurance Brokerage Assets.

52.     Indeed, consistent with the Stalking Horse Agreement, the Debtors, with the assistance of their advisors, will launch a robust sale process upon approval of the proposed bidding procedures to market the Insurance Brokerage Assets to potential buyers through the bid deadline.  The Stalking Horse Agreement offers the Debtors and their stakeholders certainty by establishing a minimum purchase price for the Insurance Brokerage Assets and signaling to other potential bidders the currently prevailing market value of the Insurance Brokerage Assets, while also affording the Debtors an opportunity to seek higher or otherwise better offers.

| Date/Time | Event |
|---|---|
| December 6, 2022 | Entry of Bidding Procedures Order |
| December 12, 2022 at 11:59 p.m. EDT | Sale Notice Deadline |
| December 12, 2022 at 11:59 p.m. EDT | Assumption and Assignment Service Deadline |
| January 4, 2023 at 4:00 p.m. EDT | Bid Deadline (due date for Bids and Good-Faith Deposits) |
| January 12, 2023 at 10:00 a.m. EDT | Auction |
| January 13, 2023 at 11:59 p.m. EDT | Deadline to enter into and file Successful Bidder Purchase Agreement with a Successful Bidder |
| January 16, 2023 at 4:00 p.m. EDT | Sale Objection Deadline |
| January 17, 2023 at 11:59 p.m. EDT | Deadline to respond to objections to the Sale of the Insurance Brokerage Assets to Successful Bidder |
| January 18, 2023 | Sale Hearing |

IMPAC 10412772v.1

53.    This timeline maximizes the prospect of receiving the highest or best offer for the Insurance Brokerage Assets while ensuring that the Debtors can close the sale of the Insurance Brokerage Assets no later than March 9, 2023, as is contemplated under the Stalking Horse Agreement.  This outside date was one of the substantive negotiated deal points upon which the Stalking Horse Bidder insisted as a condition to agreeing to serve as the stalking horse and entering into the Stalking Horse Agreement.  Further, a longer sale process would create uncertainty among the Debtors' vendors, customers, regulators, and workforce, each of which is a key business partner whose confidence and cooperation is necessary to achieve the Debtors' goals in these chapter 11 cases.

54.    In addition, as detailed above, the Prepetition Lenders continue to financially support the Debtors' business and restructuring efforts.  Indeed, in furtherance of the Debtors' proposed sale process, the Prepetition Lenders have agreed to provide the superpriority, senior secured $37.88 million DIP Facility, subject to the Court's approval.  The DIP Facility will ensure the Debtors have liquidity required to run the fulsome process contemplated in the relief requested pursuant to the Bidding Procedures Motion, close a value maximizing transaction, and, pursuant to the Plan, wind down the Debtors' remaining estates after the conclusion of the sale process.

55.    The liquidity provided by the DIP Facility, however, is necessarily finite, and therefore, maximizing the Debtors' estates will depend in large part on the Debtors' ability to swiftly proceed toward completion of their postpetition marketing and auction process as proposed herein.  To that end, the Debtors will continue their marketing process efforts immediately following the commencement of these chapter 11 cases.

IV.     **FIRST DAY MOTIONS AND RELATED RELIEF REQUESTED**

A.      **THE DEBTORS' NEED FOR DIP FINANCING AND ACCESS TO CASH COLLATERAL**

56.     Pursuant to the Debtors' DIP Financing Motion (as defined below), the Debtors seek authority to enter into the DIP Facility, use Cash Collateral, and obtain related relief.  The DIP Facility, if approved, would provide the Debtors with access to $6.3 million of new money immediately upon entry of the proposed interim order (the "Interim DIP Order") approving the DIP facility and an additional $6.3 million of new money upon approval on a final basis.

57.     As of the Petition Date, I understand that the Debtors will have approximately $102,000 of cash on hand and believe that the Debtors will require immediate access to the DIP Facility and use of Cash Collateral to ensure they have sufficient liquidity during the interim period to fund essential costs and expenses, including the costs of the Debtors' postpetition marketing and sale process, and to avoid irreparable harm to the Debtors' operations.  In addition, the Debtors will require full access to the DIP Facility after a final hearing to continue operations, fund working capital needs, and consummate the transactions contemplated in the Plan, including the wind down of the Debtors' estates.  The Debtors, with the assistance of their other advisors, have concluded that the proposed DIP Facility will be sufficient to support operations and maintain necessary liquidity on the currently contemplated schedule for these chapter 11 cases.

58.     I believe that the Debtors are in need of the immediate infusion of liquidity being provided by the proposed DIP Facility to ensure sufficient working capital to operate their business, administer their estates, and effectuate the sale process contemplated in the Bidding Procedures Motion.  Specifically, the Debtors have an immediate need to obtain the DIP Facility and to use the Cash Collateral on an interim basis to, among other things, in addition to running the sale process, (i) permit the orderly continuation of their business, (ii) maintain business

27

relationships with their vendors, insurance carriers, the Acquired Agencies, and other parties, (iii) make payroll, (iv) pay the costs of administering these chapter 11 cases, and (v) satisfy other working capital and general corporate purposes of the Debtors.

59.     The Debtors, in consultation with their advisors, have also determined that absent the funding provided by the proposed DIP Facility, the Debtors will be unable to continue operating their business at the levels that are necessary to preserve their goodwill, customer loyalty, and reputation in the marketplace.  Thus, immediate access to the DIP Facility and Cash Collateral is crucial to the Debtors' efforts to preserve value for their stakeholders during these chapter 11 cases.

60.     Based upon my conversations with the Debtors' management team and advisors and my review of the proposed budget (the "Budget"), I believe that the Debtors will not have sufficient sources of working capital and financing to operate their business in the ordinary course of business throughout these chapter 11 cases without the DIP Facility and authorized use of Cash Collateral.

###    B.    OTHER FIRST DAY MOTIONS

61.     In connection with the filing of their chapter 11 petitions, the Debtors filed the below-listed First Day Motions, which are explained in greater detail in **Exhibit A**, requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The facts set forth in each of the First Day Motions are incorporated herein in their entirety.[8]

---

[8]    Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

(i)    **Administrative Motions:**

      (1)      Joint Administration Motion. *Debtors' Motion for Entry of Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief;*

      (2)      Claims and Noticing Agent Application. *Debtors' Application Pursuant to 11 U.S.C. § 105(a) and 28 U.S.C. § 156(c) for Entry of an Order Appointing Omni Agent Solutions, Inc. as Claims and Noticing Agent;*

      (3)      Creditor Matrix Motion. *Debtors' Motion for Entry of An Order (I) Authorizing Debtors to File a Consolidated (A) Creditor Matrix and (B) Top 20 Creditors List, (II) Authorizing Redaction of Certain Personal Identification Information, and (III) Granting Related Relief;*

      (4)      Schedules and Statements Motion. *Debtors' Motion for Entry of Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs, and (II) Granting Related Relief;*

(ii)    **Operational Motions Requiring Immediate Relief:**

      (5)      DIP Financing Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Secured Liens and Provide Claims with Superpriority Administrative Expense Status, and (D) Grant Adequate Protection to the Prepetition Secured Parties, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief;*

      (6)      Cash Management Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, and (II) Granting Related Relief;*

      (7)      Insurance Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, (II) Authorizing Continuation of Insurance Premium Financing Agreement, and (III) Granting Related Relief;*

      (8)      Taxes Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

(9)     <u>Utilities Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I)(A) Approving Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Services, (B) Approving Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; and (II) Granting Related Relief*; and

(10)    <u>Wages Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Reimbursable Expenses, Employee Benefits Obligations and Other Compensation, (B) Continue Compensation and Employee Benefits Programs and Pay Related Administrative Obligations, and (II) Granting Related Relief.*

62.     The First Day Motions request authority to, among other things, enter into the DIP Facility and continue use of the Debtors' cash collateral, honor workforce-related compensation and benefits obligations, pay claims of taxing authorities, insurance providers and utility providers, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these chapter 11 cases. For the avoidance of doubt, the Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

63.     The Debtors have tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates. I believe an orderly transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm. Other requests for relief will be deferred for consideration at a later hearing.

64.     I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein. The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on the Debtors' management team

IMPAC 10412772v.1

and advisors and I can attest to such facts.  I believe that the relief requested in each of the First

Day Motions listed above (a) is necessary to allow the Debtors to operate with minimal disruption

and productivity losses during these chapter 11 cases, (b) is critical to ensure the maximization of

value of the Debtors' estates, (c) is essential to achieving a successful postpetition sale process

pursuant to the procedures proposed in the Debtors' Bidding Procedures Motion, and (d) serves

the best interests of the Debtors' stakeholders.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

65.    The Debtors' ultimate goal in these chapter 11 cases is to achieve an orderly,

efficient, consensual, and successful postpetition sale process to maximize the value of the

Debtors' estates for their stakeholders.  To minimize any loss of value, the Debtors' immediate

objective is to maintain a business-as-usual atmosphere during these chapter 11 cases, with as little

interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants

the relief requested in each of the First Day Motions, the prospect for achieving these objectives

and completing a successful sale process of the Debtors' insurance brokerage services business

will be substantially enhanced.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 30, 2022                         _/s/ Raphael Wallander_____
                                                Name:  Raphael Wallander
                                                Title:    Independent Manager and Sole
                                                          Member of the Special Committee of
                                                          Vesta Holdings, LLC

IMPAC 10412772v.1

## EXHIBIT A

**Evidentiary Support for First Day Motions[1]**

---

[1]    Capitalized terms used in this **Exhibit A** but not otherwise defined herein shall have the meanings ascribed to such terms in the applicable First Day Motion.

I.  **DEBTORS' MOTION FOR ENTRY OF ORDER (I) DIRECTING JOINT ADMINISTRATION OF RELATED CHAPTER 11 CASES AND (II) GRANTING RELATED RELIEF (THE "<u>JOINT ADMINISTRATION MOTION</u>").[1]**

1.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing joint administration of these chapter 11 cases for procedural purposes only and (b) granting related relief.  Given the integrated nature of the Debtors' operations, I believe joint administration of these chapter 11 cases will provide administrative convenience without harming the substantive rights of parties in interest.

2.      I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, I respectfully request that the Joint Administration Motion be approved.

II.  **DEBTORS' APPLICATION PURSUANT TO 11 U.S.C. § 105(a) AND 28 U.S.C. § 156(c) FOR ENTRY OF AN ORDER APPOINTING OMNI AGENT SOLUTIONS, INC. AS CLAIMS AND NOTICING AGENT (THE "<u>CLAIMS AND NOTICING AGENT RETENTION APPLICATION</u>").**

3.      Pursuant to the Claims and Noticing Agent Retention Application, the Debtors seek entry of an order appointing Omni Agent Solutions, Inc. ("<u>Omni</u>") as claims and noticing agent in the Debtors' chapter 11 cases effective as of the Petition Date.

4.      I believe that the relief requested in the Claims and Noticing Agent Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the Claims and Noticing Agent Retention Application.

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

III. **DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING DEBTORS TO FILE A CONSOLIDATED (A) CREDITOR MATRIX AND (B) TOP 20 CREDITORS LIST, (II) AUTHORIZING REDACTION OF CERTAIN PERSONAL IDENTIFICATION INFORMATION, AND (III) GRANTING RELATED RELIEF (THE "<u>CREDITOR MATRIX MOTION</u>").**

5.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to file a consolidated (i) list of creditors in lieu of submitting a separate mailing matrix for each Debtor, and (ii) list of the Debtors' 20 largest unsecured creditors in lieu of submitting a separate list for each Debtor; (b) authorizing the Debtors to redact certain personal identification information; and (c) granting related relief.

6.      I believe that filing a single consolidated list of the 20 largest unsecured creditors is most efficient and appropriate here.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task, and would lead to administrative burdens, costs, and result in duplicate mailings. Furthermore, the Debtors have filed an application to retain and employ a claims and noticing agent.  If such application is granted, the claims and noticing agent will assist with, among other tasks, mailing of notices to parties.  I believe that the Consolidated Creditor Matrix will be sufficient to allow the claims and noticing agent to provide notice to all creditors as well as applicable parties in interest during the chapter 11 cases.

7.      Furthermore, I believe it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in the chapter 11 cases the email addresses and home addresses of any of the Debtors' employees, individual creditors and equity security holders, to the extent applicable, because disclosing such information could be used by third parties, among other things, to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking who have otherwise taken steps to conceal their whereabouts.

2

8.      I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the Creditor Matrix Motion be approved.

## IV.    DEBTORS' MOTION FOR ENTRY OF ORDER (I) EXTENDING TIME TO FILE SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENTS OF FINANCIAL AFFAIRS AND (II) GRANTING RELATED RELIEF (THE "<u>SCHEDULES EXTENSION MOTION</u>")

9.      Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order (a) extending the initial fourteen (14) day period to file schedules of assets and liabilities and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by an additional thirty (30) days (the "<u>Deadline</u>"), without prejudice to the Debtors' right to request additional time if necessary; and (b) granting related relief.

10.      I believe the relief requested is appropriate and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Given that the Debtors' resources are particularly limited at this juncture, the amount of work required to complete the Schedules and Statements, and the competing demands facing the Debtors to stabilize the Debtors' business operations during the initial phase of these chapter 11 cases, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the initial fourteen-day period after the Petition Date.  Accordingly, on behalf of the Debtors, I respectfully request that the Schedules Extension Motion be approved.

**V.    DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, AND (C) MAINTAIN EXISTING BUSINESS FORMS, AND (II) GRANTING RELATED RELIEF (THE "CASH MANAGEMENT MOTION").**

11.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors, in their sole discretion, to (i) continue to operate their Cash Management System; (ii) pay any prepetition or postpetition amounts outstanding on account of the Bank Claims; and (iii) maintain existing Business Forms in the ordinary course of business; and (b) granting related relief.

12.    To facilitate the efficient operation of their business, the Debtors operate a centralized cash management system (the "Cash Management System").  I understand that cash collections average approximately $1.7 million per month, including payments made by cash, check, and electronic fund transfers ("ETFs"), and also include some payments made by customer credit cards.  The Debtors estimate that total ordinary course disbursements will average approximately $1.23 million per month during these chapter 11 cases.

13.    As of the Petition Date, the Cash Management System includes a total of seventy (70) bank accounts (collectively, the "Bank Accounts"),[2] each of which is identified on **Exhibit C**[3]

---

[2]    Although the Cash Management System includes seventy (70) Bank Accounts as of the Petition Date, the Debtors may close existing accounts or open new accounts in the ordinary course of business.

[3]    Certain of the Bank Accounts detailed on Exhibit C to the Cash Management Motion are held under the name of certain insurance agencies that the Debtors have acquired pursuant to asset purchase agreements (the "Legacy Bank Accounts"), as part of the Debtors' growth strategy detailed herein.  The Legacy Bank Accounts, although held under the name of the applicable acquired insurance agency, are owned and operated by Summit, pursuant to Summit's purchase of the Legacy Bank Accounts under the terms of the respective asset purchase agreements. Accordingly, certain of Summit's employees are the sole signatories on each of the Legacy Bank Accounts, except those Legacy Bank Accounts that are scheduled for decommission.  Currently, the Legacy Bank Accounts temporarily remain in the name of the applicable acquired insurance agency solely for accounting purposes while Summit transitions the customers and insurance carriers of the applicable acquired insurance agency over to the Bank Accounts held under the name of Summit.  This transition period is required because the Legacy Bank Accounts are the designated deposit accounts in the original contract between the applicable acquired insurance agency, insurance carrier, and customer.  Accordingly, unless the underlying customer contract is amended, the Debtors must maintain the Legacy Bank Accounts until the applicable customer ceases making premium

4

hereto.  The Bank Accounts are held at six (6) different banks:  Bank of America, N.A., Bankwell Bank ("Bankwell"), JPMorgan Chase Bank N.A., First National Bank, M&T Bank Corporation, and Southern First Bank (collectively, the "Banks").  Each of the Bank Accounts are insured by the Federal Deposit Insurance Corporation.  I understand that the Cash Management System is based around the central collection and disbursement accounts maintained by Summit (collectively, the "Operating Accounts").  The Cash Management Schematic details how the Operating Accounts interact throughout the Cash Management System, including with the premium trust bank accounts used for the remittance of payment between the Insurance Carriers and the Debtors (the "Premium Trust Accounts").  I can attest to the summary of the Cash Management System set forth in the Cash Management Motion.

14.    Due to the nature of the Debtors' business and the disruption to the business that would result if the Debtors were required to close their existing Bank Accounts, I believe that it is critical that the Debtors' Cash Management System remains in place on a postpetition basis. Moreover, due to the complexity of the Cash Management System, any delay in granting the relief requested in the Cash Management Motion would severely disrupt the Debtors' operations at this critical juncture and jeopardize the Debtors' ability to maximize the value of their estates for the benefit of all stakeholders.  Thus, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest,

---

payments to the designated Legacy Bank Account or is transitioned over to a designated Operating Account.  I understand that this is standard practice in the Debtors' industry.  I further understand that the Legacy Bank Accounts receive approximately 5%-10% of Summit's monthly revenue and such amounts are transferred to designated Operating Accounts in the ordinary course.  The Debtors anticipate that approximately $150,000 will be deposited into the Legacy Bank Account per month by the applicable customers and insurance agencies during the pendency of these Chapter 11 Cases.  The Debtors seek relief in the Motion to continue to transfer these amounts from the Legacy Bank Accounts to designated Operating Accounts to fund their ordinary course operations.  For the avoidance of doubt, the Debtors will not transfer any amounts into the Legacy Bank Accounts during the pendency of these Chapter 11 Cases, and the Debtors have implemented internal control procedures to implement that restriction.  The Legacy Bank Accounts detailed on Exhibit C to the Cash Management Motion are identified by an asterisk.

and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on

behalf of the Debtors, I respectfully request that the Cash Management Motion be approved.

## VI.    DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) MAINTAIN EXISTING INSURANCE POLICIES AND PAY ALL INSURANCE OBLIGATIONS ARISING THEREUNDER, AND (B) RENEW, SUPPLEMENT, MODIFY, OR PURCHASE INSURANCE COVERAGE, (II) AUTHORIZING CONTINUATION OF INSURANCE PREMIUM FINANCING AGREEMENT, AND (III) GRANTING RELATED RELIEF (THE "<u>INSURANCE MOTION</u>").

15.     Pursuant to the Insurance Motion, the Debtors request entry of interim and final

orders (i) authorizing the Debtors to (a) maintain their existing insurance policies and pay all

obligations arising thereunder or in connection therewith, and (b) renew, supplement, modify or

purchase insurance coverage; (ii) authorizing the Debtors, in their sole discretion, to continue the

Debtors' insurance premium financing agreement; and (iii) granting related relief.  I have reviewed

and can attest to the facts set forth in the Insurance Motion.

16.     The Debtors maintain approximately nine Insurance Policies administered by

multiple third-party Insurance Carriers.  The Insurance Policies provide coverage for, among other

things, workers' compensation, business owner's liability, commercial property, excess

professional liability, professional liability, cyber liability, and management liability.

17.     The Debtors generally pay premiums with respect to the Insurance Policies either

up front or as a combination of a down payment and monthly payments to the Debtors' insurance

broker.  Additionally, some, but not all, of the Insurance Policies are financed through the

Insurance Financing Agreement.  As of the Petition Date, the Debtors have paid all the premiums

and financing charges under the Insurance Financing Agreement.

18.     With respect to the Insurance Policies not covered by the Insurance Financing

Agreement, the Debtors pay these premiums in full on an annual basis; no amounts under these

Insurance Policies will come due during the Interim Period.  The last premium due under the

6

Insurance Policies covered by the Insurance Financing Agreement was paid on October 16, 2022, in the amount of approximately $8,500. The Debtors estimate that, as of the Petition Date, there are no amounts due and owing, and only approximately $8,500 will come due during the Interim Period.

19.    I believe that the failure to receive the requested relief at the outset of these Chapter 11 Cases may cause the Insurance Carriers to seek to terminate the Insurance Policies which would require the Debtors to obtain replacement coverage at a higher rate. The Lender may further seek to accelerate the entire unpaid premiums under the Insurance Financing Agreement. These events would distract the Debtors from the vital task of stabilizing their business through this process and disrupt the Debtors' operations at this important juncture. Further any payment interruptions may have an adverse effect on the Debtors' future ability to obtain insurance coverage at reasonable rates. Additionally, given prevailing practices in the well-established industry for premium financing, the Debtors believe that it is highly unlikely they would be able to obtain financing for their financed premiums absent a secured financing agreement. The relief requested in the Insurance Motion is necessary for the Debtors to operate their business in the ordinary course and preserve and maximize the value of the Debtors' operations and their estates for the benefit of all stakeholders.

20.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully request that the Insurance Motion be approved.

## VII. DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION TAXES AND FEES AND (II) GRANTING RELATED RELIEF (THE "TAXES MOTION").

21.    Pursuant to the Taxes Motion, the Debtors request entry of interim and final orders (a) authorizing, but not directing, the Debtors to remit and pay Taxes and Fees accrued prior to the Petition Date that will become due and payable during the pendency of these Chapter 11 Cases, including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date and (b) granting related relief.

22.    The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the Authorities will not exceed approximately $11,000 in the aggregate, all of which will come due before the entry of the Final Order.  To the best of the Debtors' knowledge, the Taxes and Fees generally consist of current tax and fee obligations and are not in respect of catch-up payments, other than any prepetition payments that were interrupted by the commencement of these Chapter 11 Cases.

23.    Failure to receive the requested relief would expose the Debtors to additional liability to or collection activity by the Authorities.  The Authorities may also initiate audits against the Debtors or attempt to suspend the Debtors' operations.  These actions would distract the Debtors from the vital task of stabilizing their business through this process and disrupt the Debtors' operations at this important juncture.  Moreover, unpaid Taxes and Fees may result in penalties and accrual of interest to all parties' detriment.  I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully request that the Taxes Motion be approved.

IMPAC 10412772v.1

**VIII.  DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) (A) APPROVING DEBTORS' PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES, (B) APPROVING DEBTORS' PROPOSED PROCEDURES FOR RESOLVING ADDITIONAL ASSURANCE REQUESTS, AND (C) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES; AND (II) GRANTING RELATED RELIEF (THE "<u>UTILITIES MOTION</u>").**

24.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (i)(a) approving the Debtors' proposed form of adequate assurance of payment for future utility services to the Utility Providers, (b) approving the Debtors' proposed procedures for resolving additional requests for adequate assurance in substantially the form proposed in the Interim Order (the "<u>Adequate Assurance Procedures</u>"), and (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services; and (ii) granting related relief.

25.     In connection with the operation of their business and management of their properties, the Debtors obtain sewage, water, electric, natural gas, garbage, security, telephone, internet, information technology, and other similar services (collectively, the "<u>Utility Services</u>" and, the obligations arising therefrom, the "<u>Utility Obligations</u>") from the Utility Providers.  As of the Petition Date, the Debtors had approximately 38 utility accounts.  A list of the Debtors' Utility Providers and the respective Utility Services they provide (the "<u>Utility Provider List</u>") is attached as <u>Exhibit C</u> to the Utilities Motion.

26.     Further, pursuant to approximately four of the Debtors' lease agreements, certain Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments in the ordinary course of business.

27.     Prior to the Petition Date, the Debtors paid on average approximately $16,000 per month for Utility Services based on a historical average payment for the twelve (12)-month period ended September 30, 2022.  The Debtors do not anticipate that the monthly average will change

materially during these Chapter 11 Cases.  I do not anticipate that the monthly average will change materially during these chapter 11 cases.

28.     The Debtors intend to pay all timely undisputed postpetition obligations owed to the Utility Providers.  The Debtors believe that cash held by the Debtors, cash generated in the ordinary course of business, and cash available to the Debtors under their proposed debtor in possession financing facility will provide sufficient liquidity for the Debtors to pay their postpetition Utility Obligations in the ordinary course of business.

29.     While the Debtors believe that the foregoing may be sufficient to satisfy the requirements under section 366 of the Bankruptcy Code, as additional assurance of payment, the Debtors propose to, within five (5) days of the Petition Date, place a deposit equal to approximately two (2) weeks of the Debtors' average monthly cost of Utility Services, $8,000 into a segregated account for the benefit of each Utility Provider.

30.     The Debtors require the Utility Services to properly maintain and support their ongoing business operations.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.  I believe that such disruption would adversely affect, among other things, customer goodwill and employee relations, which, in turn, would jeopardize the Debtors' efforts to reach a value-maximizing resolution for the Debtors' Estates and all of their stakeholders.  Therefore, it is imperative that Utility Services continue uninterrupted during these chapter 11 cases.

31.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully request that the Utilities Motion be approved.

IX.   **DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) PAY PREPETITION WAGES, REIMBURSABLE EXPENSES, EMPLOYEE BENEFITS OBLIGATIONS AND OTHER COMPENSATION, (B) CONTINUE COMPENSATION AND EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS, AND (II) GRANTING RELATED RELIEF (THE "<u>WAGES MOTION</u>").**

32.   Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay Prepetition Employee Obligations and related expenses arising under or related to Compensation and Benefits Programs and (b) continue their Compensation and Benefits Programs in effect as of the Petition Date and pay related administrative obligations; and (ii) granting related relief.

33.   As of the Petition Date, the Debtors estimate the Prepetition Employee Obligations to be approximately $700,000.  Of this amount, approximately $600,000 will become due and payable during the Interim Period.

A.   **Debtors' Workforce**

34.   As of the Petition Date, the Debtors employ 133 employees (the "<u>Employees</u>"), including 131 full time employees (the "<u>Full Time Employees</u>"), and two part time employees (the "<u>Part Time Employees</u>").   Of the Debtors' Employees, approximately 97 are salaried employees and approximately 36 are paid hourly.  In addition, the Debtors also utilize seven independent contractors and consultants ("<u>Independent Contractors</u>") that serve as insurance agents, salespersons, and management advisors for the Debtors.  I understand that the Debtors do not seek authority to pay any prepetition amounts in excess of $15,150.00 per Employee.

35.   The Employees and Independent Contractors perform a wide variety of functions, which are mission-critical to the preservation of value and the administration of the Debtors' estates.  In many instances, I understand that the Employees and Independent Contractors include personnel who are intimately familiar with the Debtors' business, processes, and systems,

11

who have developed relationships with the customers, suppliers, and other key counterparties that are essential to the Debtors' business, and who cannot be easily replaced.  Without the continued, uninterrupted services of the Employees and the Independent Contractors, I believe that the Debtors' business operations will be halted immediately and the administration of the estates materially impaired.

36.    Furthermore, the Debtors pay a monthly fee to me, as the independent manager on the board of managers of Debtor Vesta Holdings, LLC (the "Board").  The Debtors believe that my service is necessary for the continued management of the Debtors.  I receive fees, in the aggregate, of $25,000 per month.  As of the Petition Date, the Debtors do not owe me any accrued and unpaid fees for my services as independent manager on the Board.

### B.    The Debtors' Compensation and Benefits Programs

37.    In the ordinary course of business, I understand that the Debtors make certain payments, contributions, deductions, and withholdings under or related to Wages, Payroll Service Fees, the Performance Incentive Plan, the Commission Program, PTO, Reimbursable Expenses, and Employee Benefits Programs (each as defined below and, collectively, the "Compensation and Benefits Programs")[4] for the Employees and certain of the Independent Contractors, as applicable.

---

[4]    Certain of the Debtors' Employees are subject to individual employment agreements with the Debtors, which govern the specific terms of those Employees' employment, compensation, and benefits (collectively, the "Employment Agreements").  The terms of such Employees' compensation and benefits may differ from the Debtors' Compensation and Benefits Programs described in the Wages Motion.  The Debtors do not seek authority to pay any obligations to Employees under the Employment Agreements unless otherwise consistent with the relief requested in the Wages Motion.  The Debtors reserve the right to seek authority in the future by separate motion to pay any obligations to Employees under the Employment Agreements that are not otherwise consistent with the relief requested in the Wages Motion.

### 1.    Wages

38.    I understand that the Debtors incur obligations to their Employees and Independent Contractors for, among other things, wages, salaries, overtime, and other obligations described herein (collectively, "Wages").  The Employees and Independent Contractors are paid in arrears on a bi-weekly basis by direct deposit.  The Debtors' average gross payroll is approximately $400,000.[5]  The payroll for the period ending October 19, 2022, was approximately $405,000, including employer-paid taxes, for all the Employees and Independent Contractors and was paid on October 21, 2022.  The Debtors' next scheduled payroll date is November 4, 2022 for the payroll period ending November 2, 2022.  The Debtors estimate that, as of the Petition Date, approximately $360,000 in Wages has accrued and is owing to Employees and Independent Contractors, inclusive of withholdings, other tax obligations, and any amounts attributable to uncashed paychecks on account of prior payroll periods (the "Unpaid Wages").  I believe that failure to pay the Unpaid Wages may lead to widespread departures at all levels of the Debtors' corporate structure.

### 2.    Payroll Service Fees

39.    I understand that the Debtors' payroll system is administered externally using Paychex, Inc. ("Paychex"), a third-party payroll processor.  Paycheck supports the Debtors' operations by providing payroll processing, payroll tax calculations and filings, and other payroll-related services.  The Debtors pay Paychex for its payroll services via direct withdraw based on the total amount of Wages to be paid per payroll cycle (the "Payroll Service Fees").  On average, the Debtors pay approximately $3,500 per month in Payroll Service Fees to Paychex.

---

[5]    This Debtors' average weekly gross payroll is an estimate based on recent average weekly payrolls, excluding payroll taxes.  Certain of the Debtors' Employees are hourly Employees with variable hours each week.  As a result, the amount of gross weekly payroll is subject to fluctuation.

The Debtors plan to continue their use of Paychex for payroll administration and during the pendency of these chapter 11 cases, and the Debtors seek authority to continue to honor amounts owed to Paychex in the ordinary course of business during these Chapter 11 Cases to ensure continued access to Paychex's services.

### 3. Incentive Programs

#### (i) Commissions

40.     In addition to receiving a base salary, certain of the Debtors' rank and file sales Employees and Independent Contractors, known as Producers and Account Managers (together, the "Commission Eligible Employees"), are eligible to receive quarterly commission incentive payments in the ordinary course of business for achieving specified new and renewal policy quotas (the "Commission Program").  Payments made under the Commission Program are based on the Commission Eligible Employees obtaining new insurance policies and the renewal of such policies.  As depicted in the below chart, the amount of the commission payments is determined based on the type of insurance policy issued or renewed, the job title of the applicable Commission Eligible Employee, and a percentage of the amount of the premiums paid under the respective polices.

41.     Currently, there are 30 Commission Eligible Employees participating in the Commission Program.  Payments under the Commission Program are paid monthly to the Commission Eligible Employees.  Historically, payments made under the Commission Program have totaled between approximately $65,000 to $100,000 per month.  Amounts paid under the Commission Program depend upon each Commission Eligible Employee's performance during the applicable quarter.  The payments provided under the Commission Program are an integral part of the aggregate compensation package for the Commission Eligible Employees and provide substantial value to the Debtors' estates because such payments reward Commission Eligible

14

Employees for new policy growth and align such Employees' interests with the objectives of the Debtors.

42.      As of the Petition Date, the Debtors estimate that they will owe approximately $150,000 on account of prepetition Commission Program obligations during these Chapter 11 Cases, $100,000 of which will become due and payable in the Interim Period.  Accordingly, the Debtors seek authority to pay all accrued and unpaid prepetition obligations on account of the Commission Program and to continue to pay obligations on account of the Commission Program in the ordinary course of business on a postpetition basis during these Chapter 11 Cases.

*(ii)*      ***Performance Incentive Plan***

43.      In the ordinary course of business, the Debtors maintain an annual incentive plan to reward certain rank and file Employees for achieving specified performance metrics that align such Employees' interests with the operational goals and objectives of the Debtors (the "Performance Incentive Plan").  The Performance Incentive Plan awards are based off of specified annual EBITDA metrics to be met by the Debtors' personal and commercial lines of business.  Specifically, participating Employees are eligible to receive payment under the Performance Incentive Plan equivalent to a designated percentage of the Debtors' personal or commercial line EBITDA, as applicable, that is in excess of a specified EBITDA threshold.  The EBITDA thresholds are determined by the Debtors, in their sole discretion.  No Insiders (as such term is defined in section 101(31) of the Bankruptcy Code) are eligible to participate in the Performance Incentive Plan.

44.      Currently, I understand that only two rank and file Employees[6] participate in the Performance Incentive Plan.  I understand that such Employees are instrumental in effectuating

---

[6]      The titles of the two Employees who participate in the Performance Incentive Plan are:  Vice President of Personal Lines and Vice President of Commercial Lines.

15

the Debtors' business plan, which is focused on the growth of their insurance brokerage business. I understand that payments under the Performance Incentive Plan are paid annually to the participating Employees.  These payments are typically made in the first quarter of the year following the year for which performance is measured.  The payments provided under the Performance Incentive Plan are an integral part of the aggregate compensation package for the participating Employees and provide substantial value to the Debtors' estates because such payments reward Employees for new growth and align such Employees' interests with the objectives of the Debtors.

45.    As of the Petition Date, the Debtors estimate that they will owe approximately $50,000 on account of prepetition Performance Incentive Plan obligations during these Chapter 11 Cases, none of which will become due and payable in the Interim Period.  Accordingly, by this Motion, the Debtors seek authority to continue to pay obligations on account of the Performance Incentive Plan in the ordinary course of business on a postpetition basis during these Chapter 11 Cases solely pursuant to the Final Order.

### (iii)    *Portfolio Performance Plan*

46.    I understand that the Debtors also maintain a quarterly incentive plan to reward certain rank and file Employees in the Debtors' sale department for exceeding specified thresholds for the renewal of existing personal line policies, the sale of new personal line policies, and overall work production (the "Portfolio Performance Plan").  Specifically, the Portfolio Performance Plan awards are comprised of: (a) 65% of eligible Employee's achievement of the policy retention threshold; (b) 25% of eligible Employee's achievement of the new policy threshold; and (c) 10% of eligible Employee's achievement of the work production threshold.  The Debtors determine the Portfolio Performance Plan thresholds in their sole discretion.  As discussed below, I understand that no Insiders (as such term is defined in section 101(31) of the Bankruptcy Code) are eligible to

16

participate in the Portfolio Performance Plan.

47.     Currently, I understand that 46 rank and file Employees[7] participate in the Portfolio Performance Plan.  These Employees are instrumental in effectuating the Debtors' business plan, which, as discussed herein, is focused on the growth of their insurance brokerage business. Payments under the Portfolio Performance Plan for the retention of personal line policies are paid quarterly to the participating Employees and payments for the sale of new personal line policies and achieving work production thresholds are paid annually.  Historically, payments made under the Portfolio Performance Plan have totaled between approximately $500 to $3,500 per quarter. The payments provided under the Portfolio Performance Plan are an integral part of the aggregate compensation package for the participating Employees and provide substantial value to the Debtors' estates because such payments reward Employees for policy retention and new policy growth in furtherance of the objectives of the Debtors.

48.     As of the Petition Date, the Debtors estimate that they will owe approximately $30,000 on account of the Portfolio Performance Plan during the pendency of these Chapter 11 Cases, all of which will become due and payable in the Interim Period.  The amounts due in the Interim Period are for prepetition amounts owed for eligible Employees' achievement of the policy retention thresholds established for the quarter ending September 30, 2022.  Accordingly, by this Motion, the Debtors seek authority to pay all accrued and unpaid prepetition obligations on account of the Portfolio Performance Plan and to continue to pay obligations on account of the Portfolio Performance Plan in the ordinary course of business on a postpetition basis during these Chapter 11 Cases.

---

[7]     The titles of the 46 Employees who participate in the Portfolio Performance Plan are:  Account Manager, Customer Service Representative, and the Vice President of Personal Lines.

### *(iv)    No "Insiders" Receive Payments Under The Incentive Plans*

49.    After discussion with legal counsel, I understand that none of the Employees participating (the "Incentive Plan Participants") in the Performance Incentive Plan and the Portfolio Performance Plan (together, the "Incentive Plans") is an "insider."  As an insurance brokerage business, the Debtors' operations consist of the sale and renewal of personal and commercial insurance policies that are underwritten by various insurance carriers with whom the Debtors conduct business.  The Incentive Plan Participants are not officers or persons in control of the Debtors.  Rather, the Incentive Plan Participants include employees from the Debtors' sales department such as account managers, customer service representatives, and two vice presidents.

50.    I understand that most of the Incentive Plan Participants consist of account managers and customer service representatives in the Debtors' personal insurance business.  These Employees are primarily tasked with selling new personal insurance policies and obtaining renewals of existing policies.  These Employees report directly to the Vice President of Personal Lines.  These Employees do not direct corporate-wide policy or governance.  These Employees are not officers, board members, or participants in board meetings.

51.    In addition, I understand that there are two vice presidents who participate in the Incentive Plans.  These two Employees manage the Debtors' sales departments for the commercial and personal lines of business.  These Employees, among other things, facilitate sales reporting between the Debtors' senior management and local branch offices and oversee the implementation of new sales initiatives and policies established by the Debtors' senior management.  These two vice president Employees report directly to senior management and attend sales reporting meetings with senior management and the sales staff of local branch offices.

52.    I understand that these Employees were afforded the title of "Vice President" due to their respective roles in a particular line of business.  Further, I understand that these two vice

18

president positions were established to (a) develop a reporting structure between the local branch managers and the Debtors' senior management team and (b) manage local branches and their sales teams to further the Debtors' growth strategy and implement policies established by senior management.  These two Employees, however, do not direct corporate-wide policy or governance. These two Employees are also not officers, board members, or participants in board meetings.

53.     Accordingly, while the responsibilities of the Incentive Plan Participants are integral to the growth of the Debtors' business, I understand that they are not "insiders."

### 4.     Paid Time Off Programs

54.     Prior to the Petition Date, I understand that the Debtors offered Full Time Employees and eligible Part Time Employees other forms of compensation, including paid time off for observed holidays, vacation, sick leave, bereavement leave, and other earned time off (collectively, "PTO").  These forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified employees to operate their business.

### 5.     Expense Reimbursement

55.      I understand that the Debtors have expense reimbursement policies for certain preapproved travel, lodging, ground transportation, meals, automobile usage (gas or mileage), and miscellaneous business expenses (collectively, "Reimbursable Expenses").  The Reimbursable Expenses are ordinary course expenses that the Debtors' Employees incur in performing their job functions.

56.     During the last two (2) pay periods, an average of approximately $2,000 was reimbursed to the Debtors' Employees with respect to Reimbursable Expenses.  The Debtors estimate that in the last twelve (12) months, approximately eight (8) Employees submitted monthly expenses for reimbursement of charges.  While not all Employees have submitted their recent

expenses for reimbursement, the Debtors estimate that approximately $1,500 of Reimbursable Expenses are currently owed directly to Employees as of the Petition Date.

57.     The Debtors request authority to pay or reimburse all remaining prepetition Business Expenses, and to continue the use of the polices relating to the reimbursement of Business Expenses.

### 6.     Employee Benefits Programs

58.     I understand that the Debtors offer Full Time Employees, and their eligible dependents, the ability to participate in a number of insurance and benefits programs, including, without limitation, (a) medical, dental, vision, and prescription drug coverage, (b) workers' compensation program, (c) 401(k) plans, and (d) miscellaneous other benefits provided to the Full Time Employees in the ordinary course of business (collectively, the "Employee Benefits Programs").  The Debtors may have obligations under certain of these Employee Benefits Programs ("Employee Benefits Obligations") that remain unpaid as of the Petition Date because such obligations have accrued either in whole or in part prior to the Petition Date, but do not become payable in the ordinary course of the Debtors' business until after the Petition Date.

59.     The amounts set forth below reflect the approximate cost of such Employee Benefits Programs, which the Debtors are requesting authorization to continue to pay in the ordinary course of business, regardless of whether such obligations arose prepetition or postpetition.  These programs are an important component of the total compensation offered to the Employees and are essential to the Debtors' efforts to maintain Employee morale and to minimize attrition.  The Debtors believe that the expenses associated with such programs are reasonable and necessary considering the potential attrition, loss of morale, and loss of productivity that would occur if such programs were discontinued.

20

### (i)    Health Care Benefits

60.    In the ordinary course of their business, I understand that the Debtors offer their Employees the opportunity to participate in a number of health benefits programs, including medical, prescription, dental, and vision plans, among others (collectively, the "Health Care Benefits"). Specifically, I understand that the Debtors provide the following:

- Medical Plans:  The Debtors offer medical insurance through Blue Cross Blue Shield of Florida ("BCBS").  Through BCBS, the Debtors maintain several fully insured medical plans (the "Medical Plans").  When Employees enroll in a Medical Plan, they also receive prescription drug coverage through BCBS. Under the Medical Plans, the Debtors make monthly premium payments to BCBS.  The average monthly premium amount for the Medical Plans is approximately $60,000.  As of the Petition Date, I understand that there are no amounts due and owing on account of the Medical Plans.

- Vison Plans:  The Debtors provide vision coverage to eligible Employees through Humana, Inc. (the "Humana Vision Plan").  The average monthly premium amount for the Humana Vision Plan is approximately $3,000.  As of the Petition Date, I understand that there are no amounts due and owing on account of the Humana Vision Plan.

- Dental Plans:  The Debtors provide dental coverage to eligible Employees through Humana, Inc. (the "Humana Dental Plan").  The average monthly premium amount for the Humana Dental Plan is approximately $500.  As of the Petition Date, I understand that there are no amounts due and owing on account of the Human Dental Plan.

### (ii)    Workers' Compensation Program

61.    I understand that the Debtors provide workers' compensation benefits (the "Workers' Compensation Program") to the Employees.  In particular, under the laws of the various jurisdictions in which they operate, the Debtors are required to maintain policies and programs to provide Employees with workers' compensation benefits.  In accordance with this obligation, the Debtors maintain workers' compensation insurance policies in all jurisdictions where they operate.  The workers' compensation benefits provided by the Debtors are covered primarily under the Debtors' workers' compensation insurance programs administered by Hartford

Fire & Casualty Group ("Hartford") and Technology Insurance Company ("Technology Insurance," and together with Hartford, the "Workers' Compensation Insurers").  Payment is made annually to the Workers' Compensation Insurers on account of the workers' compensation premium payments.  Premiums to the Workers' Compensation Insurers for current policy periods, which end on May 15, 2023 and September 3, 2023, respectively, including administrative fees, total approximately $25,000.  Currently, I understand that there are no claims pending on account of the Workers' Compensation Program.  As of the Petition Date, I understand that there are no outstanding amounts due and payable on account of the Workers' Compensation Program..

62.     I understand that the failure to maintain workers' compensation insurance could result in administrative or legal proceedings against the Debtors and their officers and directors and could cause employee departures, which would disrupt the business.  Accordingly, the Debtors respectfully request authority to (a) lift the automatic stay to permit Employees to pursue their workers' compensation claims, if any, in the appropriate judicial or administrative forum and (b) pay all workers' compensation obligations as they become due in the ordinary course of the Debtors' business on a postpetition basis.

### (iii)    401(k) Plans

63.     I understand that certain of the Debtors sponsor two 401(k) retirement savings plans (the "401(k) Plans") for Employees.[8]  The 401(k) Plans are provided by Insurance Depot Agency, LLC and Nationwide Financial Services, Inc.  Currently, the applicable Debtors contribute

---

[8]     The 401(k) Plans are legacy benefit plans provided by Debtors Summit and Dunham Insurance Agency, LLC ("Dunham").  The Debtors assumed the obligations under the 401(k) Plans as part of their acquisitions of Summit and Dunham.  The Employees enrolled in the 401(k) Plans at the time of such acquisitions remain eligible to participate in the 401(k) Plans, however, no new Employees are eligible to enroll in the 401(k) Plans.  Currently, five (5) Employees participate in the 401(k) Plans.

IMPAC 10412772v.1

additional monies to the Employee's 401(k) Plan accounts, such matching policy consists of 100% of the first 4.0% of eligible employee compensation.

64.     As of the Petition Date, the Debtors estimate that they will owe approximately $3,500 on account of the 401(k) Plans during these Chapter 11 Cases, all of which will become due and payable in the Interim Period.  Accordingly, by this Motion, the Debtors seek authority to pay all accrued and unpaid prepetition obligations on account of the 401(k) Plans and to continue to pay obligations on account of the 401(k) Plans in the ordinary course of business on a postpetition basis during these Chapter 11 Cases.  The Debtors also request authorization to process any Employee contributions to the 401(k) Plans or pay any administrative fees related to the 401(k) Plans that become due during the pendency of these Chapter 11 Cases.

### 7.     Deductions, Withholdings and Payroll Taxes

65.     For each applicable pay period, the Debtors routinely deduct, directly or indirectly through Paychex, certain amounts from Employee paychecks, including, without limitation, garnishments, child support, and similar deductions, as well as pre- and after-tax deductions payable pursuant to certain of the Compensation and Benefits Programs discussed herein (such as an Employee's share of health care insurance premiums, 401(k) contributions, legally ordered deductions and miscellaneous deductions) (collectively, the "Deductions"), and forward such amounts to various third-party recipients.  The Debtors estimate that, as of the Petition Date, they have forwarded all amounts for Deductions already deducted from prior payrolls to the appropriate third-party recipients before the Petition Date.

66.     In addition to the Deductions, I understand that federal and state laws require the Debtors to withhold amounts related to federal, state, and local income taxes and Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withholdings").  I understand that the Debtors must then match the withheld

23

amounts from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholdings, the "Payroll Taxes"). In the aggregate, I understand that the Payroll Taxes total approximately $100,000 per bi-weekly pay period (including both the Employee and employer portions). I understand that the Payroll Taxes are generally processed and forwarded to the appropriate federal, state and local taxing authorities at the same time the Employees' payroll payments are disbursed.

67.    As of the Petition Date, the Debtors estimate that they will owe approximately $80,000 on account of prepetition Payroll Taxes, all of which will become due and payable in the Interim Period. In total, the Debtors estimate that approximately $380,000 of Payroll Taxes obligations will become due and payable in the Interim Period, comprising approximately $80,000 of prepetition Payroll Taxes and approximately $300,000 of postpetition Payroll Taxes. Accordingly, the Debtors request authority to pay any prepetition obligations on account of the Payroll Taxes and to continue to honor such obligations as they come due in the ordinary course of business on a postpetition basis. The Debtors also request authority to forward any prepetition Deductions or Withholdings (and to continue to forward Deductions and Withholdings on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

68.    Especially now, as the Debtors pursue orderly chapter 11 and sale processes, I believe it is crucial that the Debtors are able to retain their Employees that are familiar with their operations and have valuable relationships with vendors and customers. Disruptions to the Debtors' operations, including spending time to identify new potential Employees and training

24

new Employees would be detrimental to the Debtors' operations and the success of these Chapter 11 Cases.

69.    Moreover, I believe that continuing the Compensation and Benefits Programs and paying the Prepetition Employee Obligations (and related Payroll Service Fees) is critical to the success of these Chapter 11 Cases.  Any delay or disruption in the provision of the Compensation and Benefits Programs likely will destroy the Debtors' relationships with the Employees and irreparably impair workforce morale at the very time when the dedication, confidence and cooperation of the Employees is most critical.  In addition, bolstering the morale of the Employees and ensuring the uninterrupted availability of their services will assist the Debtors in maintaining a "business as usual" atmosphere to the extent possible and preserving the Debtors' ability to continue to operate their business and preserve relationships with customers and other important constituencies.

70.    Finally, I believe that paying Prepetition Employee Obligations will benefit the Debtors' estates and their stakeholders by allowing the Debtors' business operations to continue without interruption.   I believe that without these payments, the Employees may become demoralized and unproductive because of the significant financial strain and other hardship many of the Employees will experience as a result.  Indeed, without the requested relief, it is possible that Employees at all levels of the Debtors' organization will leave for alternative employment. Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to implement their sale process.  The loss of valuable Employees and the resulting need to recruit new personnel to replenish the Debtors' workforce would be distracting and counterproductive at this critical time, during which the Debtors are maintaining the stability of their operations and seeking a sale of the Insurance Brokerage Assets in chapter 11.

71.    Accordingly, on behalf of the Debtors, I respectfully request that the Wages Motion be approved.

**EXHIBIT B**

**Outstanding Litigation Schedule[1]**

---

[1]    Capitalized terms used in this **Exhibit B** but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

| Case Number (Filing Date) | Court | Plaintiff(s) | Defendant(s)[1] | Basis of Plaintiff Claim(s) |
|---|---|---|---|---|
| Case No. 515179/-2022<br><br>(Filed 5/24/2022) | Supreme Court of New York, Kings County | BMT Capital Group Inc. | • JOSHUA WILLIAM COLEMAN<br>• BURTONVIC CAPITAL, LLC<br>• SA BENEFIT SERVICES LLC^[2]<br>• MRM ASSURANCE SERVICES INC (PA)<br>• VESTA HOLDINGS LLC (PA)*[3]<br>• MOMENTUM RISK MANAGEMENT INC<br>• SITALA HEALTH INC<br>• TABER HILL LLC<br>• COLEMAN PD INC<br>• CENTER ACADEMY MANAGEMENT SERVICES LLC<br>• SUMMIT RISK ADVISORS LLC (PA)*<br>• VEST VFO LLC (PA)<br>• KOVA CAPITAL<br>• MRM RISK HOLDINGS LLC (PA)<br>• STERLING RISK HOLDINGS<br>• MOMENTUM ADVANCED | • Plaintiff asserts claims for breach of contract and personal guarantee arising from an accounts receivable financing agreement entered into between the Plaintiff and Defendants and personally guaranteed by Defendant Joshua William Coleman. |

[1]   All Debtor entities are denoted in **boldface** type.

[2]   Each Acquired Agency listed on this **Exhibit C** shall be identified by an "^."

[3]   As detailed in the First Day Declaration, the Debtors believe that Mr. Coleman's alleged misconduct includes the alleged misappropriation of funds drawn under certain financing agreements, which draws were prompted by Mr. Coleman's use of alleged fraudulent documents and the creation of entities with identical names to the Debtors in multiple jurisdictions.  Each entity that has the same corporate name as a Debtor entity but that is formed in a different jurisdiction will be identified in this **Exhibit B** by an "*."

| Case Number (Filing Date) | Court | Plaintiff(s) | Defendant(s)[1] | Basis of Plaintiff Claim(s) |
|---|---|---|---|---|
| | | | PLANNING LLC (PA) | |
| Index No. 132894-2022<br><br>(Filed 5/24/2022) | Supreme Court of State of New York, Ontario | Apex Funding Source LLC | • JOSHUA WILLIAM COLEMAN<br>• SA BENEFIT SERVICES LLC^<br>• MRM ASSURANCE SERVICES INC (PA)<br>• BURTONVIC CAPITAL LLC (PA)<br>• VESTA HOLDINGS LLC (PA)*<br>• MOMENTUM RISK MANAGEMENT INC (PA)<br>• SITALA HEALTH INC (PA)<br>• TABER HILL LLC (PA)<br>• COLEMAN PD INC (PA)<br>• CENTER ACADEMY MANAGEMENT SERVICES LLC (PA)<br>• SUMMIT RISK ADVISORS LLC (PA)*<br>• VEST VFO (PA)<br>• KOVA CAPITAL (PA)<br>• MRM RISK HOLDINGS (PA)<br>• STERLING RISK HOLDINGS (PA)<br>• MOMENTUM ADVANCED PLANNING (PA) | • Plaintiff and Defendants entered into a stipulation of settlement in connection with Plaintiff's claims of breach of contract and personal guarantee arising from an accounts receivable financing agreement entered into between the Plaintiff and Defendants and personally guaranteed by Defendant Joshua William Coleman.<br>• Defendants defaulted in performance under the stipulation of settlement and court entered judgment against Defendants. |
| Case No. FST-CV22-6057399<br><br>(Filed 6/10/2022) | Superior Court of Connecticut, Stamford/Norwalk | BRIDGE FUNDING CAP, LLC D/B/A | • JOSHUA WILLIAM COLEMAN | • Plaintiff asserts claim for breach of contract arising from an accounts receivable financing |

| Case Number (Filing Date) | Court | Plaintiff(s) | Defendant(s)[1] | Basis of Plaintiff Claim(s) |
|---|---|---|---|---|
| | | SKYFALL FUNDING | <ul><li>BURTONVIC CAPITAL, LLC</li><li>MRM ASSURANCE SERVICES INC. (PA)</li><li>VESTA HOLDINGS, LLC (PA)*</li><li>MOMENTUM RISK MANAGEMENT, INC.</li><li>TABER HILL, LLC</li><li>COLEMAN PD, INC.</li><li>CENTER ACADEMY MANAGEMENT SERVICES, LLC</li><li>SA BENEFIT SERVICES, LLC^</li><li>STRATA HOLDINGS LLC</li><li>VESTA CAPITAL MARKETS, LLC</li><li>KOZLOWSKI CONSULTING GROUP, LLC</li><li>BROWARD INSURANCE LLC</li><li>RAINBOW INSURANCE</li><li>FRAZIER INSURANCE, LLC</li><li>AMIRL INSURANCE</li><li>WC INSURANCE AGENCY LLC</li><li>BMP INSURANCE SERVICES</li><li>WHOLESALE INSURANCE SERVICES</li><li>SUMMIT RISK ADVISORS, LLC (PA)*</li></ul> | agreement entered into between the Plaintiff and Defendants and personally guaranteed by Defendant Joshua William Coleman. |

| Case Number (Filing Date) | Court | Plaintiff(s) | Defendant(s)[1] | Basis of Plaintiff Claim(s) |
|---|---|---|---|---|
| | | | • VESTA VFO (PA)<br>• KOVA CAPITAL<br>• MRM RISK HOLDINGS, LLC (PA)<br>• STERLING RISK HOLDINGS, LLC<br>• LIFECHAIN, INC.<br>• THYINE DEFENSE, INC.<br>• MOMENTUM ADVANCED PLANNING, LLC (PA)<br>• JJKC MANAGEMENT COMPANY, LLC<br>• ATLANTA INSURANCE AGENCY SERVICES, LLC<br>• TRIPP INSURANCE, LLC<br>• PRIME CO INSURANCE<br>• SEK HOLDING CO LLC<br>• EAST COAST HEALTH INSURANCE LLC<br>• DUNHAM INSURANCE AGENCY LLC (PA)*<br>• GALEN INSURANCE<br>• B&Z INSURANCE AGENCY LLC<br>• SITALA HEALTH, INC.<br>• GRIFFIN AVIATION LLC<br>• VESTA RENEWABLES, LLC<br>• FORT MYERS BEACH INSURANCE | |

IMPAC 10412772v.1

| Case Number (Filing Date) | Court | Plaintiff(s) | Defendant(s)[1] | Basis of Plaintiff Claim(s) |
|---|---|---|---|---|
| | | | • BROWARD INSURANCE, LLC<br>• RAINBOW INSURANCE<br>• 639 OCEAN, LLC | |
| Case No. 714435-2022<br><br>(Filed 7/12/2022) | Supreme Court New York, Queens County | Cloudfund LLC (dba Unique Capital) | • Joshua W. Coleman<br>• **Vesta Holdings LLC**<br>• Momentum Advanced Planning, LLC<br>• Burtonvic Capital LLC<br>• MRM Assurance Services<br>• Strata Holdings LLC<br>• Momentum Advanced Planning LLC<br>• SEK LLC<br>• Vesta Capital Markets LLC<br>• MRM Risk Management LLC | • Plaintiff asserts claim for breach of contract arising from an accounts receivable financing agreement entered into between the Plaintiff and Defendants and personally guaranteed by Defendant Joshua William Coleman. |
| Case No. 519939/2022<br><br>(Filed 7/13/2022) | Supreme Court of New York, King County | Brownstone Funding Corp. | • Joshua William Coleman<br>• Burtonvic Capital LLC<br>• MRM Assurance Services Inc.<br>• Sitala Health Inc.<br>• JJKC Management Company LLC<br>• Lifechain Inc.<br>• Thyine Defense Inc.<br>• MRM Risk Management LLC<br>• SA Benefit Services, LLC^<br>• Excellence Insurance, LLC<br>• SEK Holding Co.<br>• Strata Holdings LLC | • Plaintiff asserts claim for breach of contract arising from an accounts receivable financing agreement entered into between the Plaintiff and Defendants and personally guaranteed by Defendant Joshua William Coleman. |

| Case Number (Filing Date) | Court | Plaintiff(s) | Defendant(s)[1] | Basis of Plaintiff Claim(s) |
|---|---|---|---|---|
| Case No. 519916/2022<br><br>(Filed 7/13/2022) | Supreme Court of New York, King County | Daka Capital Group Inc. | <ul><li>Joshua William Coleman</li><li>Burtonvic Capital LLC</li><li>MRM Assurance Services Inc.</li><li>Sitala Health Inc.</li><li>JJKC Management Company LLC</li><li>Lifechain Inc.</li><li>Thyine Defense Inc.</li><li>MRM Risk Management LLC</li><li>SA Benefit Services LLC^</li><li>Excellence Insurance, LLC</li><li>SEK Holding Co.</li><li>Strata Holdings LLC</li></ul> | <ul><li>Plaintiff asserts claim for breach of contract arising from an accounts receivable financing agreement entered into between the Plaintiff and Defendants and personally guaranteed by Defendant Joshua William Coleman.</li></ul> |
| Case No. 220904293<br><br>(Filed 7/14/2022) | Third Judicial District Court, Salt Lake City, Utah | Libertas Funding, LLC | <ul><li>Joshua Coleman</li><li>Vesta Holdings, LLC (PA)*</li><li>Burtonvic Capital, LLC</li><li>KOVA Capital, LLC</li><li>Momentum Advanced Planning, LLC</li><li>MRM Assurance Services, Inc.</li><li>**Vesta Advisors, LLC**</li><li>Vesta VFO, LLC</li><li>**Summit Risk Advisors, LLC**</li></ul> | <ul><li>Plaintiff asserts claim for breach of contract in connection with the Plaintiff's and Defendants' entry into a loan and security agreement whereby Plaintiff provided a loan to Defendants in the aggregate principal amount of $1.25 million.</li></ul> |